SD:MMH
NY-NYE-848

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------ x

IN THE MATTER OF THE SEARCH OF:     :
21-08 GATES AVENUE, APARTMENT 3A,        Case No. 18-MJ-1247
RIDGEWOOD, NEW YORK 11385 AND ANY   :
CLOSED COMPARTMENTS AND
CONTAINERS, CELLULAR TELEPHONES     :
AND ITEMS CONTAINED THEREIN
                                    :

------------------------------------ X

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, CHRISTOPHER E. HERZOG, being first duly sworn, hereby depose and

state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Department of Homeland

Security, Immigration and Customs Enforcement, Homeland Security Investigations

("ICE").  I have been an ICE Special Agent for approximately fifteen years and am currently

assigned to the Border Enforcement Security Team located in Queens, New York, where I

investigate drug trafficking and money laundering, among other offenses.  During my tenure

with ICE, I have participated in narcotics investigation during the course of which I have: (a)

conducted physical and wire surveillance; (b) executed search warrants at locations where

drugs, drug proceeds, records of narcotics, money laundering transactions and firearms have

been found; (c) reviewed and analyzed numerous taped conversations and records of drug

traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations

of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking and money laundering.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs and the efforts of persons involved in drug trafficking to avoid detection by law enforcement.

2.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 21-08 GATES AVENUE, APARTMENT 3A, RIDGEWOOD, NEW YORK 11385 AND ANY CLOSED COMPARTMENTS AND CONTAINERS, CELLULAR TELEPHONES AND ITEMS CONTAINED THEREIN (the "TARGET PREMISES"), further described in Attachment A, for the things described in Attachment B.

3.     Upon information and belief, there is probable cause to believe that there is kept and concealed within the TARGET PREMISES items which constitute evidence, fruits and/or instrumentalities of the distribution or possession with the intent to distribute controlled substances, and/or conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846  (the "Subject Offenses"), among other violations of law as further described in Attachment B.

4.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information may have been provided by other agents or law enforcement officers or witnesses who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.  This affidavit is intended to show only that there is

2

sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## THE TARGET PREMISES

5.      The TARGET PREMISES is 21-08 Gates Avenue, Ridgewood, New York 11385, Apartment 3A, which is located on the third floor of a brown and tan three-story, multi-unit apartment building in Queens County, New York, and any closed containers, cellular phones and closed items found therein.   Photographs of the TARGET PREMISES are included in Attachment A.   The first photograph depicts the exterior of 21-08 Gates Avenue, Ridgewood, New York 11385, which is on Gates Avenue between Forest Avenue and Grandview Avenue.   The front entrance of 21-08 Gates Avenue, Ridgewood, New York 11385 consists of a brown wooden door with a glass pane and a beige awning located immediately above the front door.   The second photograph depicts the front door of 21-08 Gates Avenue, Ridgewood, New York 11385, with the number of the building ("2108") clearly visible on the door above the glass pane.   The third photograph depicts the third floor hallway of 21-08 Gates Avenue, which contains two apartment doors.   The blue arrow indicates the door of the TARGET PREMISES.

6.      The TARGET PREMISES is currently unoccupied based on the arrests as set forth below.

## FACTS ESTABLISHING PROBABLE CAUSE

7.      Since approximately January 2018, DHS/ICE/HSI and the New York City Police Department ("NYPD") have been investigating a heroin and fentanyl drug trafficking organization ("DTO") operating in Queens, New York that is connected to at least one overdose death.   The investigation uncovered evidence that DOUGLAS MARRA, also

3

known as "Dougie" ("MARRA") and JOSEPH McCLEAN, also known as "Max B"
("McCLEAN"), have conspired to commit the Subject Offenses.

8.     On December 19, 2018, the Honorable Steven M. Gold, U.S. Magistrate
Judge, signed warrants authorizing the arrest of MARRA and McCLEAN for conspiracy to
distribute heroin and fentanyl, in violation of 21 U.S.C § 846.   Docket No. 18-M-1236.   A
true and correct copy of the affidavit in support of the arrest warrants ("the Affidavit") is
attached hereto as Exhibit 1 and is incorporated by reference.   As set forth in the Affidavit,
during a series of undercover narcotics transactions between January 2018 and August 2018,
MARRA discussed with the undercover law enforcement officer ("the UC") the location of a
stash house in Ridgewood, New York—i.e., the TARGET PREMISES.   See Ex. 1 ¶ 9.
Further, in July 2018, McCLEAN directed the UC to meet him at the TARGET PREMISES
to complete a narcotics transaction.   See Ex. 1 ¶ 11.   MARRA and McCLEAN also used
cellular telephones to communicate with the UC, each other and other co-conspirators
regarding narcotics transactions.   See Ex. 1 ¶¶ 4-12.

9.     On December 20, 2018, law enforcement officers and agents arrested
McCLEAN and another individual at the TARGET PREMISES.   Upon entering the TARGET
PREMISES, law enforcement agents observed the following items in plain view located in the
living room: (a) a small table with white powder residue and a small rectangular instrument;
(b) an overturned milk crate with white powder residue; (c) a small table containing a digital
scale with white residue on the scale and a box of empty plastic baggies; (d) a television stand
containing a small plastic bag filled with a white crystalline substance; (e) a small plastic bag
containing a green leafy substance.   Law enforcement agents also observed multiple cellular
telephones in plain view located in the bedroom of the TARGET PREMISES.

4

10.     Based on my training and experience, I am aware that individuals engaged in narcotics trafficking often maintain supplies of narcotics, narcotics proceeds and other paraphernalia such as packaging materials, scales and ledgers in secure locations such as residences and stash houses.   I believe the aforementioned items observed in plain view in the living room of the TARGET PREMISES are consistent with paraphernalia related to narcotics trafficking.   Further, I believe that the evidence set forth herein establishes that activities related to narcotics are occurring at the TARGET PREMISES and therefore I expect to find additional evidence related to narcotics, such as narcotics, proceeds, paraphernalia and packaging materials at the TARGET PREMISES.

11.     Based on my training and experience, I am also aware that individuals engaged in narcotics trafficking often communicate using mobile telephones, in many instances multiple mobile telephones, in order to exchange text messages, electronic mail and other communications with suppliers, purchasers and co-conspirators.   As set forth herein and in the Affidavit, MARRA and McCLEAN frequently communicate using mobile telephones regarding narcotics transactions.   I therefore anticipate finding further relevant communications stored on the mobile telephones found at the TARGET PREMISES.

12.     Based on the foregoing, among other things, I believe that the TARGET PREMISES have been used by MARRA and McCLEAN in furtherance of the Subject Offenses.   Accordingly, there is probable cause to believe that the TARGET PREMISES, and the cellular telephone devices contained therein, contain evidence, fruits and instrumentalities of the Subject Offenses.

### **TECHNICAL TERMS**

13.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     *Wireless telephone*:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.     These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books", sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include GPS technology for determining the location of the device.

b.     *Digital camera*:   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images.   Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   Most digital cameras also include a screen for viewing the stored images.   This storage media can contain any digital data, including data unrelated to photographs or videos.

6

c.    *GPS*:   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains records the locations where it has been.   Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals are sent by radio, using specifications that are publicly available.   A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.    *PDA*:   A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

14. Based on my training, experience, and research, I know that some electronic devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15. As described above and in Attachment B, this application seeks permission to search for records that might be found on the TARGET PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize

the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

16.    *Probable cause.*  I submit that if a computer or storage medium is found on the TARGET PREMISES, particularly the telephones MARRA and McCLEAN used to communicate with co-conspirators, as set forth in paragraph 2 above, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few

9

examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    17.  *Forensic evidence.* As further described in in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.   Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.   For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.   For example, images

11

stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

18.      *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.   Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.   The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.   However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.   Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

19.      *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.   The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

20.      Because several people share the TARGET PREMISES as a residence, it is possible that the TARGET PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.   If it is nonetheless determined that that it is possible that the things described in this warrant could be found on

14

any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

21.    Based upon the foregoing, there is probable cause to believe that the TARGET PREMISES was used in furtherance of the Subject Offenses and that a search of the TARGET PREMISES as described in Attachment A, to seize the items set forth in Attachment B, may uncover evidence, fruits and/or instrumentalities of the Subject Offenses. Accordingly, I respectfully request that the search warrant specified above be issued.

WHEREFORE, deponent prays that a warrant be issued to search the TARGET PREMISES, further described in Attachment A, for the things described in Attachment B.

_____
CHRISTOPHER E. HERZOG
Special Agent, Department of Homeland
Security, Immigration and Customs Enforcement,
Homeland Security Investigations

Sworn to before me this
20th day of December, 2018

_____
THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property to Be Searched

The TARGET PREMISES is 21-08 Gates Avenue, Ridgewood, New York 11385, Apartment 3A, which is located on the third floor of a brown and tan three-story, multi-unit apartment building in Queens County, New York, and any closed containers, cellular phones and closed items found therein. Photographs of the TARGET PREMISES are included in Attachment A. The first photograph depicts the exterior of 21-08 Gates Avenue, Ridgewood, New York 11385, which is on Gates Avenue between Forest Avenue and Grandview Avenue. The front entrance of 21-08 Gates Avenue, Ridgewood, New York 11385 consists of a brown wooden door with a glass pane and a beige awning located immediately above the front door. The second photograph depicts the front door of 21-08 Gates Avenue, Ridgewood, New York 11385, with the number of the building ("2108") clearly visible on the door above the glass pane. The third photograph depicts the third floor hallway of 21-08 Gates Avenue, which contains two apartment doors. The blue arrow indicates the door of the TARGET PREMISES.

1







3

# ATTACHMENT B

## Items to Be Seized

The following items may be seized from the TARGET PREMISES and any closed and locked compartments and containers found therein as evidence, fruits, and instrumentalities of the distribution or possession with the intent to distribute controlled substances, and/or conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846 (the "Subject Offenses"):

    (a)    Any and all narcotics or controlled substances;

    (b) Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

    (c) Proceeds of drug trafficking, including United States currency, precious metals, jewelry, and financial instruments, including certificates of deposit and stocks and bonds;

    (d) Photographs, including still photographs, slides, negatives, digital images, video tapes, films, undeveloped film and the contents therein, in particular photographs of associates, possible co-conspirators, assets, and/or controlled substances;

    (e) Address and/or telephone books, rolodex indices, and any pagers or cell phones that have the ability to store names, addresses, telephone numbers, pager numbers, fax numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a drug trafficking relationship exists;

    (f) Indicia of occupancy, residency, rental, and/or ownership of the premises to be searched, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys;

    (g) Cellular telephones;

    (h) With respect to the search of any cellular telephone seized pursuant to item (g) above, the law enforcement personnel trained in searching and seizing electronic data may search for and seize the items for records and information listed in paragraphs (a) to (f), as well as evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history, including but not limited to:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.   To the extent it is necessary to download greater amounts of information or data from the device than referenced above, such as to bypass security passwords or mechanisms, law enforcement personnel are permitted to do so for purposes of accessing the types of evidence referenced herein.

SD:MMH/PJB
F. #2018R00663/NY-NYE-848

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | **ARREST WARRANT AND** **COMPLAINT** |
| - against - | **TO BE FILED UNDER SEAL** |
| JOSEPH MCCLEAN, also known as "Max B" and DOUGLAS MARRA, also known as "Dougie," | (21 U.S.C. § 846) 18-1236-M |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

PATRICK GILL III, being duly sworn, deposes and states that he is a Special

Agent with the United States Department of Homeland Security, Homeland Security

Investigations, duly appointed according to law and acting as such.

On or about and between January 2018 and August 2018, within the Eastern

District of New York and elsewhere, the defendants JOSEPH MCCLEAN, also known as

"Max B," and DOUGLAS MARRA, also known as "Dougie," together with others, did

knowingly and intentionally conspire to distribute and possess with intent to distribute a

controlled substance, which offense involved (a) a substance containing fentanyl, a Schedule

II controlled substance, and (b) a substance containing heroin, a Schedule II controlled

substance, contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(A)(vi))

The source of your deponent's information and the grounds for his/her belief are as follows:[1]

1.    I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI").   I have been a Special Agent with HSI for approximately two years and am currently assigned to the Border Enforcement Security Task Force, where I investigate drug trafficking and money laundering, among other offenses.   During my tenure with HSI, I have participated in narcotics investigations during the course of which I have: (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, records of narcotics, money laundering transactions and firearms have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking and money laundering.   Through my training, education and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs and the efforts of persons involved in drug trafficking to avoid detection by law enforcement.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.

---

[1]    Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

## FACTS ESTABLISHING PROBABLE CAUSE

2.      Since approximately January 2018, HSI and the New York City Police Department ("NYPD") have been investigating a heroin and fentanyl drug trafficking organization ("DTO") operating in Queens, New York that is connected to at least one overdose death.   As set forth below, the investigation has uncovered evidence that DOUGLAS MARRA, also known as "Dougie" ("MARRA") and JOSEPH MCCLEAN, also known as "Max B" ("McCLEAN"), have conspired to distribute and possess with intent to distribute heroin and fentanyl.

3.      On January 23, 2018, an individual ("the Victim") died of a drug-related overdose.   On January 24, 2018, law enforcement interviewed a witness ("W-1") who stated, in sum and substance, that W-1 and the Victim obtained heroin from an individual known to W-1 as "Dougie" and that "Dougie" works with an individual named "Max B."

4.      A search of the Victim's cellphone revealed a contact listed as "Dougie" with the phone number XXX-XXX-3976 (the "3976 Phone").   W-1, under the direction of law enforcement, called "Dougie" at the 3976 Phone.   In sum and substance, W-1 told "Dougie" that a new customer would be contacting "Dougie," and gave "Dougie" a cellphone number, which, in fact, was the cellphone number for an undercover police officer (the "UC") with the New York Police Department.   Subsequent investigation on the 3976 Phone revealed that it was associated with a Facebook account registered to MARRA.

5.      The Victim's cellphone also contained a contact listed as "Max B" with the phone number XXX-XXX-8479 (the "8479 Phone").   The investigation revealed that McCLEAN used the 8479 Phone to arrange narcotics transactions.   A review of the Victim's

4

cellphone also revealed text messages between "Max B" using the 8479 Phone and the

Victim in which McCLEAN instructed the Victim to "call Dougy."   Based on my training

and experience and knowledge of the investigation, I believe that "Dougy" refers to

MARRA.   The investigation has revealed that MCLEAN is one of the suppliers for

MARRA.

6.     Subsequently, MARRA called the same UC cellphone number that W-

1 had provided to him.   In sum and substance, the UC discussed buying heroin from

MARRA.

7.     On or about January 30, 2018, MARRA and the UC exchanged

telephone calls and text messages using the 3976 Phone to arrange the time and location for a

narcotics sale.   On that date, MARRA met the UC and sold the UC three glassines of a

substance that subsequently tested positive for the presence of heroin and fentanyl.   During

this meeting, MARRA stated, "Be careful.   This stuff is hot.   My friend died off of it."

Based on my training and experience and knowledge of the investigation, I believe that "this

stuff" referred to the heroin/fentanyl mixture MARRA sold to the UC and that MARRA was

warning the UC that the UC could overdose if the UC used the drugs from the glassines sold

to the UC.

8.     Subsequently, on multiple occasions in February and March 2018,

MARRA sold to the UC a substance that tested positive for fentanyl and heroin.   The UC

arranged these transactions by communicating with MARRA using the 3976 Phone.   On or

about February 24, 2018, MARRA informed the UC during a telephone call that he was

contemplating leaving New York and going out of state.

9.      On March 24, 2018, MARRA gave a new cellphone number to the UC,
specifically, XXX-XXX-6848 (the "6848 Phone"), and instructed the UC to contact him
using the 6848 Phone to complete narcotics-related transactions.   Between approximately
March 2018 and August 2018, the UC had several narcotics related conversations with
MARRA using the 6848 Phone.[2]   These conversations included discussions about the
quantity and price of heroin MARRA would sell to the UC and the two locations where
MARRA stored drugs—specifically, MARRA's residence located in Glendale, New York
("the Marra Residence") and a stash house located in Ridgewood, New York (the "Stash
House").   During one or more of these conversations, MARRA stated, in sum and
substance, that McCLEAN was his supervisor in the drug operation.

10.      On or about July 3, 2018, the UC met with MARRA in person to
complete a narcotics transaction.   During this meeting, an individual known as "Max," later
identified as McLEAN, arrived at MARRA's residence and introduced himself to the UC.
"Max" stated, in sum and substance and in relevant part, that after MARRA left New York,
he ("Max") would be able to provide more heroin if the UC needed it.   "Max" further stated
that the UC could obtain his phone number the next time that the UC went to the Marra
Residence to purchase narcotics.   Approximately one week later, on July 10, 2018, during a
narcotics transaction, MARRA gave the UC a telephone number so that the UC could contact
McCLEAN about purchasing heroin while MARRA was not in New York.

11.      Approximately one week later, on or about July 17, 2018, the UC
called MARRA and informed MARRA that he/she was near his residence to complete a

---

[2] Some of these telephone conversations between the UC and MARRA were recorded.

narcotics transaction as previously discussed.   MARRA, in sum and substance, instructed the UC to wait outside.   Moments later, McCLEAN called the UC and stated, in sum and substance, that the UC should not wait for "Dougie" and that the UC should meet him at his residence instead.[3]   The UC proceeded to the Stash House and called McCLEAN, who informed the UC that he would call the UC from another telephone number.   Moments later, McCLEAN contacted the UC using another telephone number and instructed the UC enter the location.   When the UC arrived at the location at the prearranged time, an unknown individual sold heroin to the UC.

12..   In total, between January 2018 and August 2018, the UC purchased a substance that tested field positive for heroin and/or fentanyl from MARRA approximately 24 times for a total of approximately 754 grams.[4]   All of the UC's narcotics transactions with MARRA occurred in Queens, New York.   During this time period, the investigation reveals that there is frequent phone contact between MARRA and McLEAN.

13.   Based on the foregoing, I believe that McCLEAN and MARRA are engaged in conspiracy to distribute and possess with intent to distribute narcotics, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(vi).

WHEREFORE, your deponent respectfully requests that the defendants

---

[3]     This residence has the same address as the Stash House MARRA had discussed with the UC in prior narcotics-related discussions.

[4]     All of the UC's meetings with MARRA were video and audio recorded.

JOSEPH MCCLEAN, also known as "Max B," and DOUGLAS MARRA, also known as

"Dougie," be dealt with according to law.

PATRICK GILL III
Special Agent, United States Department of
Homeland Security, Homeland Security
Investigations

Sworn to before me this,
17 day of December, 2018

THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK